[Crim. No. 942. Third Appellate District.—October 29, 1926.]

## THE PEOPLE, Respondent, v. HOMER VIETS et al., Defendants; LYNN SISCHO, Appellant.

[1] CRIMINAL LAW — ACCOMPLICE—CORROBORATION—EVIDENCE.—Where proof of a criminal charge is predicated primarily upon the testimony of an accomplice, the people are imperatively required by section 1111 of the Penal Code to produce evidence, independent of that of the accomplice, corroborating his testimony in order to uphold a conviction.

[2] ID. — DEGREE OF CORROBORATION REQUIRED — EVIDENCE. — Evidence corroborating the testimony of an accomplice need not in degree be such as to establish guilt, but there must be some testimony other than that of the accomplice which tends, in some slight degree at least, to implicate the defendant in the commission of the crime charged.

[3] ID.—GRAND LARCENY—ACCOMPLICE—SUFFICIENCY OF CORROBORATION —EVIDENCE.—In this prosecution for grand larceny, it is held that the evidence, independent of the testimony of certain accomplices, was sufficient to corroborate their testimony.

1. See 8 Cal. Jur. 172; 1 R. C. L. 167.
2. See 8 Cal. Jur. 178.

[4] ID.—OPPORTUNITY TO COMMIT CRIME—UNEXPLAINED POSSESSION OF
STOLEN PROPERTY—EVIDENCE—VERDICT.—Neither mere opportunity
to commit crime, unless it excludes all reasonable opportunity
for its commission by another, nor the unexplained possession of
stolen property, standing alone, is sufficient to justify a verdict of
guilty, but each of those circumstances takes on a greater amount
of evidentiary value as in proof of guilt when found to coexist
in the same case than when each stands alone without the support
of other inculpatory circumstances, and, taken together, with full
proof of the *corpus delicti,* may be regarded on appeal as ample
support for a verdict against the accused.

[5] ID. — THEFT OF TURKEYS — RECEIVING STOLEN PROPERTY — ACCOM-
PLICE—CORROBORATION.—In a prosecution under an indictment charg-
ing three persons with grand larceny of certain turkeys, where
one of the defendants testified that he had no knowledge of the
fact that the turkeys had been stolen until after they were brought
to his home by the other defendants, from which the inference
would follow that he was not actively concerned in the stealing
of the turkeys or the scheme to steal them, he would not be an
accomplice whose testimony must be corroborated.

[6] ID.—KNOWLEDGE OF THEFT—CONFLICTING EVIDENCE—VERDICT.— In
such prosecution, whether the defendant who received the stolen
turkeys was an accomplice in the larceny thereof requiring corrobo-
ration of his testimony would be for the jury on conflicting evi-
dence as to his knowledge of the theft when receiving them, and
the verdict convicting the other defendants of the larceny will be
construed to imply a finding, if necessary to the support of the
verdict, that he was not an accomplice.

[7] ID.—KNOWLEDGE ACQUIRED AFTER THEFT—CONCEALMENT — ACCES-
SORIES.—In such prosecution, the fact that the wife of the de-
fendant who received the stolen turkeys concealed her knowledge,
acquired after their theft, that they had been stolen and, having
such knowledge, gave protection to the culprits, would not make
her an accomplice under section 1111 of the Penal Code, but, at
most, an accessory under section 32 of the Penal Code.

[8] ID. — DATE OF COMMISSION OF THEFT — INSTRUCTIONS. — In such
prosecution, an instruction that "a few days' difference in the
dates upon which the offense was charged to have been committed
and upon which the same was actually committed is not material"
was not erroneous as telling the jury that the offense had been
committed, where in the same instruction the jury was told that it
is sufficient if the offense was committed within three years before

5.  See 8 **Cal. Jur.** 175.

7.  See 8 **Cal. Jur.** 175.

the. filing of the indictment for grand larceny and within one year before the filing of the indictment for petit larceny.

[9] ID.—CORPUS DELICTI—EVIDENCE—INSTRUCTIONS.—In such prosecution, where the unconflicting evidence showed that the turkeys were stolen by some party or parties at the time and place alleged, an instruction that a few days' difference in the alleged and actual dates of the offense is immaterial was harmless, even if viewed as invading the domain of fact upon the question of the *corpus delicti.*

[10] ID.—TESTIMONY OF ACCOMPLICE—CORROBORATION—EVIDENCE — INSTRUCTIONS.—In such prosecution, an instruction that if the corroborating evidence as a whole showed that the crime was committed by defendant the jury should convict is not subject to the objection that the trial court trespassed upon the function of the jury to determine the sufficiency of the evidence to corroborate the testimony of the accomplices.

[11] ID.—CORROBORATING EVIDENCE—QUESTION OF LAW — SUFFICIENCY OF CORROBORATING EVIDENCE — QUESTION OF FACT. — Whether evidence offered for the purpose of corroborating the testimony of an accomplice is "corroborating evidence," within the intent of section 1111 of the Penal Code, is a question of law for the court, but whether such evidence is sufficient to corroborate the testimony of the accomplice is a question of fact for the jury.

[12] ID. — SUFFICIENCY OF CORROBORATING EVIDENCE — NONPREJUDICIAL INSTRUCTION.—An instruction that if the corroborating evidence as a whole shows that the crime was committed by defendant the jury should convict is not prejudicial to defendant as trespassing upon the function of the jury to determine the sufficiency of the corroborating testimony of an accomplice under section 1111 of the Penal Code, since the rule as to the corroboration of an accomplice is thereby stated more favorably to the accused than he was entitled to have it stated, in that said language implies, or could reasonably have been understood by the jury to imply, that the corroborating evidence must be sufficient to show that the crime was committed by defendant, whereas corroborating evidence is sufficient if it *tends* to connect him with the commission of the crime.

[13] ID. — CIRCUMSTANCES TENDING TO SHOW GUILT — EVIDENCE — INSTRUCTIONS.—An instruction that the jury may consider all the circumstances in evidence tending to show guilt in arriving at defendant's guilt or innocence does not trespass upon the exclusive right of the jury to determine whether there were in fact any such circumstances developed by the evidence.

[14] ID.—EFFECT OF EVIDENCE — INSTRUCTIONS. — A trial judge may properly instruct the jury that certain evidence has been received

---

14.  See 8 **Cal. Jur.** 300.

to prove a certain fact without stating or suggesting its effect or commenting upon its weight.

[15] ID.—INSTRUCTIONS—CONSIDERATION AS A WHOLE.—An instruction must be considered in the light of other parts of the charge of the court on the law.

[16] ID.—INSTRUCTIONS — CIRCUMSTANCES TENDING TO SHOW GUILT — EVIDENCE—OTHER INSTRUCTIONS.—An instruction that, in determining defendant's guilt or innocence, the jury may consider all the circumstances in evidence tending to show guilt is not damaging to defendant where the jury were told in other given instructions that they must decide whether or not any particular fact or circumstance is a necessary link in the chain of evidence, and, if so, it must be proved beyond a reasonable doubt, and that each essential and independent fact relied upon to establish the main fact must be established beyond a reasonable doubt.

(1) 16 C. J., p. 698, n. 88, p. 700, n. 2, p. 701, n. 25.  (2) 16 C. J., p. 701, n. 22, p. 711, n. 21, 23, 24.  (3) 16 C. J., p. 712, n. 30; 36 C. J., p. 917, n. 2.  (4) 16 C. J., p. 705, n. 42, p. 707, n. 66, 67, p. 708, n. 87.  (5) 16 C. J., p. 682, n. 46.  (6) 16 C. J., p. 678, n. 64; 17 C. J., p. 225, n. 70.  (7) 16 C. J., p. 675, n. 22, 33.  (8) 16 C. J., p. 1050, n. 84, p. 1053, n. 93.  (9) 17 C. J., p. 343, n. 15, 16.  (10) 16 C. J., p. 948, n. 68.  (11) 16 C. J., p. 713, n. 32, p. 714, n. 33, 34.  (12) 17 C. J., p. 208, n. 78.  (13) 16 C. J., p. 944, n. 1.  (14) 16 C. J., p. 944, n. 3, p. 953, n. 35.  (15) 16 C. J., p. 1049, n. 82; 17 C. J., p. 225, n. 68.  (16) 16 C. J., p. 1053, n. 93.

APPEAL from a judgment of the Superior Court of Glenn County and from an order denying a new trial. Claude F. Purkitt, Judge. Affirmed.

The facts are stated in the opinion of the court.

George R. Freeman and Edward Bickmore for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants were charged by an indictment duly returned and filed in the superior court of Glenn County with the crime of grand larceny. The defendant Sischo, being separately tried, was found guilty of the crime so charged, and he appeals from the judgment of

15. See 8 Cal. Jur. 631.

conviction and the order denying his motion for a new trial. He claims that he is entitled to a reversal of the judgment and the order upon two grounds, to wit: 1. That the verdict is without sufficient support in the evidence; 2. That the trial court misdirected the jury upon the law of the case. The ground first stated involves the question whether the testimony given for the People in support of the charge by two alleged accomplices of the appealing defendant in the commission of the alleged crime, and which was the only direct testimony presented by the People connecting the said accused with the commission of the offense, was corroborated by other testimony as required by section 1111 of the Penal Code.

The property alleged to have been stolen by the defendants consisted of a number of turkeys of which one E. E. Willard was the owner. The indictment alleges that the three defendants named in the title hereof stole said turkeys "on or about the 15th day of November, 1925," and, while the said turkeys alleged to have been stolen by the defendants on or about said date is stated in the indictment to be 150, the district attorney, in his opening statement to the jury, said that the actual number feloniously taken on or about the time so alleged was 60, and, accordingly, at the trial attempted to prove the theft by the defendants of no greater number of the turkeys on the occasion referred to in the indictment.

It appears that E. E. Willard named in the indictment as the owner of the stolen property was, and had been, for some time prior to the fourteenth day of November, 1925, engaged on an extensive scale in the business of raising turkeys for marketing purposes, on a ranch a few miles east of the town of Willows, known as the "Hess" or "Lear" place. At the time mentioned he had seven or eight thousand turkeys grazing or ranging on said ranch and had men employed to herd them. The "Hess" or "Lear" ranch adjoins a tract of land known as the "Singletary Ranch," which was, at the date stated in the indictment, and for some time prior thereto had been, in the possession and occupancy of one W. B. Spurlock. Willard's turkeys, or a large number of them, began to wander over to and graze on the Singletary ranch, and at night-time would roost on the fences and outhouses on said premises.

The defendants Sischo and Viets were itinerant laborers, or, at all events, they were not engaged in carrying on any particular business and were without any permanent place of abode. Some time in the month of October, 1925, they found their way to the Singletary ranch without financial means, but it appears that, with the permission of Spurlock, they entered into the possession and occupancy of a small house—perhaps an ordinary cabin—situated on the said ranch about a quarter of a mile from the house occupied by Spurlock. This cabin or house is spoken of in the testimony of Viets as "the little red house." There is some testimony to the effect that Sischo and Viets secured possession of said house with the intention and for the purpose of establishing thereat "duck-hunting" facilities for the accommodation, for a consideration, of such sportsmen as might in the open season desire to engage in duck-hunting in that locality, either for sport or the market. This testimony, however, was of consequence at the trial only in so far as it tended to rebut what seems to have been the theory of the district attorney that Sischo and Viets took up their abode in the "little red house" for no other purpose than to acquire convenient opportunity for stealing those turkeys of Willard that found their "roosting" places on the fences and outhouses on the Singletary ranch, and that Spurlock was agreeable to that plan or scheme.

The witness first called by the People was Viets, who admitted that he took part in the stealing of the turkeys. His story of the criminal operations leading to his arrest on the charge set forth in the indictment makes him an accomplice of the defendant Sischo in the commission of said crime, assuming that the story was true. His testimony, given here in narrative form, is: That, previous to the time that he and Sischo took up their abode in the "little red house," he had known the defendant McKinney some fifteen or sixteen years, and had at times, for brief periods, worked for said defendant on the latter's place, near Butte City, in Glenn County; that when he, with Sischo, located in the cabin on the Singletary ranch, both he and Sischo were entirely without financial means, although Sischo owned a Ford automobile, and, seeing the Willard turkeys grazing on the said ranch and noting that they roosted at night on the fences and buildings situated thereon, it occurred to him

and Sischo that "some easy money" could be obtained by stealing and selling the turkeys. This proposition was suggested to Spurlock, who encouraged the launching and carrying out of the criminal enterprise upon an agreement between the three that each should be entitled to and receive one-third of the proceeds of the sale of all turkeys in the taking of which Spurlock should actively participate. Whether McKinney was a party to the original agreement is not clearly made to appear by Viets' testimony. However, after the agreement mentioned was entered into between the three men, the stealing of the first "bunch" of turkeys (thirteen or fourteen in number) occurred in the month of November, 1925, but prior to the fifteenth day of that month. These turkeys were taken by Viets in Sischo's Ford car to the ranch of McKinney and sold to the latter. Viets did not then tell McKinney that the turkeys had been stolen, but soon thereafter—either the same or the succeeding day— while Viets was accompanying McKinney in a car to the town of Dayton in Butte County and which is situated not far distant from Butte City, Glenn County, he (Viets) said to McKinney that the 13 or 14 turkeys referred to were "stolen turkeys," to which McKinney answered that he did not care whether they were stolen or not. Subsequently, McKinney entered into an agreement with Sischo and Viets to steal others of the Willard turkeys found roosting on the Singletary premises. This arrangement was, in substance, that Sischo and Viets were to steal the turkeys, that the "birds" should be taken to McKinney's ranch, and that they should be disposed of and the proceeds of all sales to be divided, share and share alike, between the three, provided that the proceeds of the sales of all turkeys in the stealing of which Spurlock should take an active part should be divided into four parts, each of the quartet to take a one-fourth share or interest. On or about the fifteenth day of November, 1925, in the night-time, Sischo and Viets captured 60 of the Willard turkeys perched on the fences and buildings on the Singletary ranch. The legs of the turkeys were fastened together by means of ropes or large strings and placed in two automobiles, the one Sischo's Ford car and the other a car owned by Spurlock, the last named having loaned his car to Sischo and Viets for the purpose of carrying the turkeys to the McKinney ranch. Sischo drove his own car

and Viets drove Spurlock's car. When a short distance from McKinney's, the car of Sischo ran out of gas and was for that reason "stalled" on the road, and thereupon Sischo and Viets transferred the turkeys from the former's car to the car driven by Viets. The latter then, with the 60 turkeys, proceeded to McKinney's ranch, reaching there at a late hour of the night. The turkeys were by Viets and McKinney taken from the car, their legs were unmanacled and the turkeys turned into a barn or chicken-house. McKinney drained a quantity of gas from his own car and accompanied Viets in Spurlock's car to the point at which Sischo's car was "stalled," and deposited a sufficient amount of gas in the tank of Sischo's car to enable him (Sischo) to drive it back to the "little red house," to which he thereupon immediately started to return. Viets took McKinney to his home and then returned to the Singletary ranch. On different occasions, always in the night-time, other turkeys of Willard were taken by Sischo and Viets and conveyed in automobiles to the McKinney ranch. McKinney himself owned about eight head of turkeys only. The 60 head of turkeys taken "on or about" the fifteenth day of November, 1925, were "turned loose" on the McKinney premises and thus were mixed with McKinney's and the other turkeys taken from time to time from the Singletary ranch and belonging to Willard. Some of the stolen turkeys were killed and dressed or "picked" on the McKinney ranch, Sischo assisting in that work, and were thereupon shipped to two commission houses—one in San Francisco and the other in Oakland. About 90 head were sold alive to one Linville, a farmer residing on his farm situated near the town of Princeton, in Glenn County, and five or six miles from McKinney's. There were three shipments made to the commission merchants referred to. The proceeds of the sales were received in the form of checks or drafts, and were divided between Sischo, Viets, and McKinney, the first named "receiving little better than one-third each." The sale of the turkeys to Linville brought the sum of $225. McKinney received the amount and thereafter drove to the "little red house" in which Sischo and Viets resided and gave each a one-third part thereof, and retained as his share one-third of the sum. Viets testified that from all the Willard turkeys stolen by him and his codefendants, the "snouts" or, as they

are more properly to be called, the "wattles," had been removed prior to the time the turkeys were taken by them.

The testimony of the defendant George McKinney was in harmony with that of Viets to the effect that on or about the fifteenth day of November, 1925, in the night-time (he thought near the hour of 2 o'clock A. M.) approximately 60 head of turkeys, marked by the removal of the wattles therefrom, were brought to his place by Viets, and further to the effect that, having been told by Viets that Sischo's car had "stalled" on the road a short distance from his (McKinney's) place for the want of sufficient gas to proceed farther, he drained from his own car a quantity of gas and with Viets went to the spot where Sischo had been forced to stop and provided the latter's car with enough gas to take him back to the Singletary ranch. McKinney also stated that some of the turkeys were killed and "picked" on his place, were shipped to the commission houses above mentioned from the town of Biggs in Butte County, that, in all instances but one, he personally received checks from said houses as in payment for the turkeys, and that he caused the checks to be cashed and thereupon divided the proceeds in equal parts between Sischo, Viets, and himself. He further testified that, besides the marks borne by the turkeys above described, their toes had also been removed or amputated. Sischo (McKinney proceeded) assisted in picking the turkeys preparatory to their shipment to the commission houses. About 80 of the turkeys, he continued to testify, were sold to Linville, above mentioned; that for these he received $225; that, of that amount, he deposited $75 in the bank at Butte City to his own credit, and the balance he delivered to Sischo and Viets, at their cabin on the Singletary ranch, he having, in company with Viets, gone there for that purpose. McKinney explained that, on going into the cabin, he met Sischo and that he placed the money on a table and at the same time remarked: "Here is the settlement of the turkeys," to which remark Sischo made no answer; that, on that occasion, either Sischo or Viets did say that the turkeys taken by them to McKinney's and disposed of as explained had been stolen. As to the check from the commission house as payment for a certain shipment of turkeys which he said was not sent to or personally received by him, McKinney stated that Viets and Sischo visited his (McKin-

ney's) home and that Viets delivered to the witness a portion of the money received on said check. McKinney declared that, prior to his visit to the "little red house" to deliver to Sischo and Viets their shares of the money received on the sale of certain turkeys to Linville, he had never had any conversation with Sischo and Viets, or either, in which it was said that the turkeys delivered by the latter at his place were stolen. McKinney was not cross-examined by Sischo's counsel.

Mrs. McKinney, wife of the defendant of that name, testified that turkeys were brought to their place, near Butte City, on two different nights; that, altogether, she thought that more than a hundred head had been brought and left on their premises on the night referred to by her; that, other than such information as she received from her husband on the subject, she had no knowledge as to the parties who took the turkeys to their home. On one of the occasions mentioned by her, she stated, she was at the home of her mother, where she remained overnight, and on the other she was in bed at her own home, but that the hour was so late when the parties arrived there with the turkeys that she did not arise, and, therefore, saw neither the parties nor what occurred at that time on their premises. She stated that on several occasions she saw Sischo on their place and engaged in "picking" turkeys after the turkeys were brought there as above stated by her; that she then owned nine turkeys, which were at the time running about her premises, and that, two days before Thanksgiving, 1925, Sischo "picked" one of her turkeys for the Thanksgiving dinner at their home.

W. B. Spurlock, spoken of above, was introduced by the People and testified that in November, 1925, he was residing on the Singletary ranch; that at that time he owned and maintained at the ranch an Essex automobile; that he himself owned no turkeys; that there were then a number of turkeys "ranging on and about" the Singletary ranch; that, on several occasions, he called Willard on the telephone and told him about the turkeys being and grazing on said ranch, and that thereafter "the herder came around." Spurlock, on advice of his attorney, refused further to testify on the ground that the testimony sought by the district attorney

to be elicited from him might tend to incriminate him, and such refusal was sanctioned on that ground by the court.

Alvarez Dowden, who resided with his parents about seven miles southeast of Butte City and a half-brother of the wife of the defendant George McKinney, testified that he was a visitor to the McKinney place, in the month of November, 1925, after the turkeys in question were taken there, and that on that occasion Sischo and George McKinney were engaged in picking turkeys; that at that time he (witness) remained at McKinney's for about half an hour, during which time Sischo and McKinney picked one turkey each; that some of the turkeys were running about in the yard and some were in the chicken-house; that they (Sischo and McKinney) were "catching" the turkeys in the chicken-house; that he himself caught one. He further stated that, although Viets was at McKinney's at the time, he could not remember whether he (Viets) "picked" any turkeys. He said that there were about 90 head of turkeys on McKinney's premises at that time.

Joe Dowden testified that in the latter part of November or about the 1st of December, 1925, he was a visitor at the McKinney place and there saw Viets and Sischo, and also saw McKinney deliver a piece of paper to Sischo, but that he was too far away from where the two then stood to discern or learn the nature of the paper.

E. E. Willard testified that for a number of years prior and down to November and December, 1925, he was engaged in the business of raising, buying and selling turkeys; that in 1925 he had about 8,000 head of turkeys; that he divided them into several bands or herds, and kept them in different places in the neighborhood of his ranch; that in November, 1925, a large number of his turkeys roamed over and ranged and roosted on the Singletary ranch. He stated that, prior to November, 1925, he marked all his turkeys by cutting off their wattles. The market value of his turkeys in said month of November, he said, was about $5 per head. About one month after the fifteenth day of November, 1925 (Willard continued) he went to the farm of Linville (mentioned above), near Princeton, and there saw 84 head of his turkeys; that he knew that they were his turkeys because of the fact that from all that number the wattles had been removed, as he had himself marked and caused them to be

marked. He also on the same day went to the McKinney ranch, where he saw three of his turkeys, marked as indicated above. In this connection it should be stated that McKinney stated, when testifying, that three of the stolen turkeys were not disposed of, but were kept alive on his place.

Deputy Sheriff Heard, who was present with Sischo and the district attorney in the latter's office, in the latter part of December, 1925, testified that on that occasion the witness, in a conversation with Sischo, accused the last named of stealing the turkeys in question; that Sischo replied: "You fellows have got the dope on me; I will take the jolt rather than let Spurlock take it."

The foregoing statement embraces, in synoptical form, substantially all the testimony introduced by the People. The defendant did not testify nor offer any testimony in rebuttal of the case made by the People.

Section 1111 of the Penal Code, among other things, declares: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[1] By the above provision of section 1111, the People, in the prosecution of a party for a public offense, and the proof of the charge is predicated primarily upon the testimony of an accomplice of the accused in the commission of the crime, are imperatively required to produce evidence, independent of the testimony of the accomplice, which corroborates that of the latter, otherwise the conviction of the accused will be wholly wanting in a legal foundation to uphold it. [2] The corroborating evidence, however, need not in degree be such as to establish guilt, "for in that event the testimony of an accomplice would not·be needed." (*People v. Ames,* 39 Cal. 403, 406; *People v. Compton,* 123 Cal. 403 [56 Pac. 44].) All that is required in such a case is that there be produced some testimony other than that of the accomplice which tends, in some slight degree at least, to implicate the defendant in the commission of the crime for which he is on trial. (*People v. Clough,* 73 Cal. 348, 351 [15 Pac. 5]; *People v. Wagner,* 36 Cal. App. 41 [171

Pac. 699].) "If there be some independent evidence fairly
tending to connect the defendant with the commission of the
crime, then, the testimony of the accomplice is corroborated
within the intent of section 1111 of the Penal Code."
(*People* v. *Blunkall,* 31 Cal. App. 778 [161 Pac. 997].)
"The corroborating evidence is sufficient if it, of itself, tends
to connect the defendant with the commission of the offense,
although it is slight, and entitled, when standing by itself,
to but little consideration." (*People* v. *McLean,* 84 Cal.
480, 482 [24 Pac. 32]; see, also, *People* v. *Mace,* 71 Cal.
App. 10 [234 Pac. 841].)

[3] Measured by the requirement of section 1111 of the
Penal Code, as construed by the appellate courts of this state
as indicated by the foregoing cases and many others which
have not been and need not be named, as to the *quantum* of
evidence which will suffice for the corroboration of the testi-
mony of an accomplice implicating his codefendant in the
commission of a crime, the evidence introduced by the People
in this case, independent of the testimony of Viets, admit-
tedly an accomplice, and that of McKinney, assuming that he,
too, was a party to the crime charged and, therefore, an ac-
complice, is amply sufficient as in corroboration of the testi-
mony of said witnesses. Eliminating from consideration
entirely the testimony of Viets and George McKinney—as-
suming that neither had testified—and there remains, as in
proof of guilt, the testimony disclosing these facts: 1. That,
prior to and at the time mentioned in the indictment, a
large number of the Willard turkeys had been and were
stolen from the Singletary premises; 2. That Viets and
Sischo had been and then were residing in a cabin on said
ranch and thus were afforded an opportunity for taking the
turkeys; 3. That the Willard turkeys had been and were
marked in such an unusual manner as to afford their ready·
identification by their owner, or by anyone familiar with
the "Willard mark," as thus it may be described; 4. That on
each of two different occasions, and late in the night-time,
a large number of turkeys were taken to and left at the
McKinney ranch, one of these occasions being the time stated
in the indictment, when about 60 head were taken to and left
at said place or ranch; 5. That, in the month of November,
1925, McKinney had on his premises eight or nine turkeys
only which belonged to him, but that in said month and about

the time referred to in the indictment there were running about his premises or cooped in the chicken-house thereof a hundred or more turkeys other than those of which he was the owner; 6. That 80 or more turkeys, bearing the Willard mark, and which Willard, a few days subsequent to the discovery of the loss of his turkeys, saw on the Linville ranch, situated a few miles only from the McKinney place, were positively identified by Willard as his turkeys and of the number which had been taken from the Singletary premises at the time alleged in the indictment; 7. That, on the same day that he saw and identified the turkeys last referred to, Willard also found at McKinney's three turkeys, bearing his mark, and which he positively identified as turkeys belonging to him which has been stolen from the Singletary ranch at the time stated in the indictment; 8. That the appealing defendant, Sischo, after the date named in the indictment as the time of the commission of the larceny charged, assisted, on several different occasions, in the "picking" of turkeys on the McKinney ranch. Thus we have before us, aside from the testimony of both Viets and McKinney, proof of the stealing of the turkeys, or opportunity to commit the crime, of the positive identification of the stolen property by the owner and of the possession thereof by Sischo and his codefendants within a brief time subsequent to the date on which it is alleged that the crime charged was perpetrated. The circumstances thus recounted, it cannot be denied, afford not slight but very strong corroborative support of the testimony of Viets and McKinney. In fact, the conclusion that the testimony presented by the People, apart from that of Viets and McKinney, would itself be sufficient to uphold a conviction would not be stretched or far-fetched. [4] It is true that neither mere opportunity to commit a crime, unless it excludes all reasonable opportunity for its commission by another, nor the unexplained possession of stolen property, standing alone, is sufficient to justify a verdict of guilty, and will, therefore, not support such a verdict. (*People* v. *Tarbox,* 115 Cal. 57, 63 [46 Pac. 896, 897]; *People* v. *Silva,* 48 Cal. App. 728, 737 [192 Pac. 330], on the proposition first stated; *People* v. *Boxer,* 137 Cal. 563, 564 [70 Pac. 671]; *People* v. *Nichols,* 39 Cal. App. 29, 34 [177 Pac. 861], on the proposition secondly stated.) But each of these circumstances

takes on a greater amount of incriminatory significance or evidentiary value as in proof of guilt when they are found to coexist in the same case than when each stands alone or by itself without the support of other inculpatory circumstances, and, taken together, with full proof of the *corpus delicti*, may well be regarded on appeal as ample support for a verdict against the accused. At any rate, as stated, the corroborating evidence in this case is such as fully to meet the test of sufficiency prescribed by section 1111 of the Penal Code, as that section has been construed and the doctrine thereof applied by the higher courts of the state.

[5] To what is said above it is well to add that, while some of the circumstances of the criminal transactions seem to be equally as strong against McKinney as against Viets and Sischo, still McKinney testified that he had no knowledge of the fact that the turkeys had been stolen until after they were brought to his place by Viets and Sischo. From that statement the inference would follow that he was not actively concerned in the stealing of the turkeys or the scheme to steal them. If this was the fact then McKinney, while doubtless guilty under the evidence of receiving stolen property, would not be an accomplice of Viets and Sischo in the larceny of the turkeys (Pen. Code, sec. 1111). [6] The most, then, that could be said of the situation as to McKinney would be that an evidentiary conflict arose upon the question of whether he was an accomplice, in which case it would fall within the sole province of the jury to decide, upon the whole evidence, whether McKinney was or was not in fact an accomplice. In such case, the verdict, if necesssary to its support, would be construed to imply a finding by the jury that he was not an accomplice. The proposition, however, is not of material consequence in this case since, as is hereinabove disclosed, the testimony of both Viets and McKinney is, as to the essentially vital matters to which it relates, substantially the same, and the corroboration of the testimony of the one is necessarily the corroboration of that of the other.

[7] As to the witness Mrs. George McKinney, there is no evidence in the record, nor, indeed, is it here claimed, that she was a *particeps criminis* in the asportation of the turkeys, and she, therefore, cannot be regarded as an accomplice of Viets and Sischo or of her husband,

assuming that he was a party to the stealing. The most that could be said of the effect of the testimony upon her position in the transaction involving the felonious taking of the turkeys by Sischo and Viets is that a possible interpretation of her own testimony by the light of the other circumstances in the case might lead to the conclusion that, after the thefts, she acquired and possessed knowledge of the felonious taking of the turkeys, that she concealed the fact of such knowledge from the authorities, or, having such knowledge, gave protection to the culprits, and thus became an accessory (Pen. Code, sec. 32), or, as it was described at common law, "an accessory after the fact." But, even if such were her actual position in the case (and we do not affirm or intend even to insinuate that the record shows it), she would not be an accomplice under our statute. (Pen. Code, sec. 1111, *supra.*)

The next contention is that the court committed grave error in the following parts of its charge to the jury:

"1. *A few days difference in the dates upon which the offense was charged to have been committed in the indictment, and upon which the same was actually committed is not material.* It is sufficient so long as the offense was committed within three years before the filing of the indictment as to grand larceny, and within one year before the filing of the indictment as to petit larceny."

"9. Corroborating evidence in addition to that of an accomplice need not go to every fact and detail covered by the accomplice's testimony and such corroborating evidence may be of a character that if it stood alone it would be entitled to but little weight though it must be more than to create mere suspicion, but it need not be of itself absolutely convincing, and it may be circumstantial as well as by direct evidence. *And if you find therefore from the corroborating evidence as a whole that the crime was committed by the defendant you should vote guilty.*"

"12. The jury is entitled to take into consideration in arriving at the guilt or innocence of the defendant *all of the circumstances in evidence, tending to show such guilt,* and if such consideration of the evidence shows the commission of the offense, your verdict should be guilty."

[8] The complaint against the instruction first in the order above given is predicated upon what is said in the

language therein in italics, whereby, it is here urged, the court virtually told the jury that the offense charged in the indictment had actually been committed. The entire instruction, the part particularly here assailed as well as the other parts thereof, contains a correct abstract statement of a thoroughly established rule in criminal law, and, we think, when considered in connection with the entire charge of the court, may properly be regarded as no more than such a statement. [9] But granting that the jury might have understood it to be the purpose of the court to apply the challenged clause of the instruction concretely or to the instant case, still it is clear that it could have done the accused no harm, since there can be no question but that the evidence without conflict discloses that the crime charged and described in the indictment was committed by some party or parties at the time and place indicated in the accusatory pleading. There is, indeed, no pretense here, nor was there any serious claim at the trial, that the turkeys were not stolen at the time and place mentioned by somebody. The only question really open to controversy at the trial was whether there was sufficient legal evidence presented by the People to justify a conviction of the appealing accused under the indictment, and, as is plainly to be seen, the instruction under review, even if it is to be viewed as being susceptible to the construction that it slipped a trifle into the domain of fact upon the question of the *corpus delicti* and that the jury might have so considered it, was not intended to take from the jury, nor could it have that effect, the question of the guilt or innocence of Sischo.

[10] To the instruction secondly presented hereinabove (instruction No. 9), the objection is that the court thereby trespassed upon the function of the jury in that in effect it therein told the jury that there was introduced by the People evidence legally corroborative of that of the accomplice or accomplices. The objection, as a legal proposition, is without merit. [11] Whether the evidence offered for the purpose of corroborating the testimony of an accomplice is "corroborating evidence," within the intent of section 1111 of the Penal Code, is a question of law to be passed upon and determined by the court. Whether such evidence, being introduced upon the assent of the court, is sufficient to meet the requirement of said section as to the *quantum* of proof

necessary to corroborate the testimony of the accomplice, is a question of fact for determination by the jury. As to this the instruction did not, obviously, impinge upon the function of the jury, but left the question solely to their decision upon an instruction founded upon or, substantially, in the language of section 1111. [12] The rights of the defendant on trial, however, could not in any event have suffered prejudice from the instruction or the language thereof to which objection is here specifically directed (the language in italics), since the rule as to the corroboration of an accomplice is thereby stated more favorably to the accused than he was entitled to have it stated, in that said language implies, or could by the jury reasonably have been understood to imply, that the corroborating evidence must be sufficient to show "that the crime was committed by the defendant"; whereas, as before explained, the corroborating evidence is sufficient if it *tends* to connect the defendant with the commission of the crime, and if the jury justifiably finds this to be so, then the testimony of the accomplice may be considered and given, as may that of any other witness, such weight as the jury may deem it to be entitled to, and upon that testimony, with such corroborating proof, the jury may find the accused guilty, if they be satisfied that the testimony of the two classes is true and together sufficient to establish guilt.

[13] The objection to the instruction third in the order given above (No. 12) is devoid of substantial merit. The specific complaint against the instruction arises from the language thereof in italics, as to which it is insisted that the court thereby in effect stated to the jury that the evidence introduced in the case disclosed circumstances tending to show the guilt of the defendant on trial, and, so it is argued, thus trespassed upon the exclusive right of the jury to find or determine whether there were in fact any such circumstances developed by the evidence. [14] It has never been doubted that a trial judge may properly state that certain evidence has been received into the case to prove a certain fact without, of course, stating or suggesting its effect or commenting upon its weight. We can perceive nothing more than that in the instruction under review. There may be circumstances disclosed by the evidence *tending* to support or prove a certain issue, yet the jury may believe and

find that, although tending to prove the fact, they are not sufficient to prove it to the degree legally required. The instruction does not say that there were circumstances sufficient to prove the guilt of the defendant on trial. **[15]** Moreover, the instruction, which, it seems to us, states a mere commonplace, must be considered, as presumptively it was considered by the jury, in the light of other parts of the charge of the court on the law. **[16]** Elsewhere in the charge the court instructed: "It is for you to decide whether or not any particular fact or circumstance is a necessary link in the chain of evidence, and if you decide that such fact or circumstance is a necessary link, then it must be proven to your satisfaction beyond a reasonable doubt." Again, the court instructed: "When independent facts and circumstances are relied upon to identify the accused as the person committing the offense charged, each material fact and circumstance necessary to complete such chain or series of independent facts tending to establish the guilt should be established to the same degree of certainty as the main fact which these independent circumstances taken together tend to establish, that each essential and independent fact in the chain or series of facts relied upon to establish the main fact must be established to a moral certainty and beyond a reasonable doubt and if the jury should then have a reasonable doubt upon any single essential fact relied upon to complete the chain of circumstances they cannot convict the defendant as long as they entertain such doubt."

With those instructions in view it is difficult to see how the defendant's case could have been damaged by the instruction under present consideration, assuming, but not deciding, that the court by giving the latter strayed a short distance across the line of demarcation between questions of law and those of fact.

The judgment and the order appealed from are affirmed.

Finch, P. J., and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1926.