[Civ. No. 17375.   Second Dist., Div. Three.   Feb. 17, 1950.]

MARY JENSEN, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Lane & McGinnis for Petitioner.

William E. Simpson, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

SHINN, P. J.—Petitioner Mary Jensen was named as one of four defendants joined in an indictment charging the abortion and murder of a 17-year-old girl whom we shall refer to as Miss B. She made a motion under section 995, Penal Code, to quash the indictment and the same having been denied, she has applied for prohibition upon the ground that the indictment is void as to her because of the absence of any evidence before the grand jury to connect her with the charged offenses. The salient facts are stated in the companion case of *Bunker* v. *Superior Court, ante,* p. 107 [214 P.2d 825], this day decided, and are referred to as supplementing the facts to be hereinafter stated.

The evidence before the grand jury, insofar as it relates in any manner to petitioner, consists of testimony as to the following facts: Petitioner was a nurse employed by Dr. Frank Bunker at his office at 4230 South Figueroa Street in Los Angeles; Mrs. B, mother of deceased, testified that about 6 or 7 o'clock in the evening of May 20th, she received ,a telephone call from someone who did not identify himself, but whom she believed to be Dr. Eisoff, telling her to have her daughter at 4230 South Figueroa at 7:30 the next morning. The caller also stated, "When you get there, say you are Dr. Arons' patient." These instructions were followed. Upon arrival at the stated address, they were met by Mary Jensen and Dr. Leonard Arons. Mary told them to get Miss B undressed, which they did, putting a hospital nightgown on her. Dr. Arons came in and felt the girl's stomach. At his direction, Mary also felt her stomach. As she did so, Dr. Arons said, "Here, feel here. Oh, nothing to it. That's just liquid." The parents were then taken to a separate room where the proposed abortion was discussed, and where the father paid Dr. Arons $500. Mary Jensen was not present when the money was paid, but as they were leaving this room, Dr. Arons asked Mary, "Did you give her a capsule?" The parents went home. About 10 a. m., Mrs. B received a phone call from Mary: "She said, 'Oh, Mrs. [name], I think you better come down.' She said, 'The doctor decided we needed surgery. . . . They're going to take her to the South Hoover

Hospital, and doctor is over there now,' she said, 'making arrangements for surgery.' And she said, 'When they take her over there she will go in as an acute appendectomy.' I said, 'Mary, tell me first, is there anything wrong?' She said, 'No, don't worry, just come down.' And she did say that when [name] came out of the ether to tell her that if the nurses asked her anything to say it was appendicitis.'' The parents went back to Dr. Arons' office. Mary met them, and said ''nothing was wrong,'' but ''the doctor ·decided she better be taken to the hospital.'' The ambulance came, and Mary said to lay her down flat, for ''it's an acute appendectomy.'' The patient was taken away. At Mary's request the parents signed a statement releasing Dr. Bunker from liability in connection with the case. Later, at the hospital, when the girl came out of the ether, she said, ''Where is Mary? Mother, Mary is awfully nice.'' Mr. B, the father, testified that late in the afternoon of May 20th they received a phone call from an unidentified person who stated that an appointment had been arranged for Miss B for 7:30 the next morning ''at a clinic at 42nd and Figueroa,'' and that they were to ''ask for Mary'' and say that they had ''come to see Dr. Arons.'' They followed these instructions. He did not learn that the address to which they took their daughter was that of Dr. Bunker's offices until after the attempted abortion took place. When Dr. Arons entered the office to speak to them, Mary left the room. Dr. Arons said he would ''pack'' the patient and it would not be dangerous at all. He then asked for the money, and was paid $500 in cash. DR. BLUECHEL: At about 9:45 a. m., May 21st, he received a phone call from Mary, the nurse at Dr. Bunker's office. Mary ''stated that Dr. Arons, who was working in Dr. Bunker's office, had a surgical case, acute appendicitis, and wanted to know if I would operate.'' She did not mention the name of the·patient, nor any treatment that Dr. Arons might have given the patient. OFFICER JOKISCH: He and his partner arrested Mary on May 30th. As they were admitted to her apartment the phone rang. It was an attorney. Mary spoke to him, and then stated that ''she had been advised not to give us a statement or not to talk to us regarding this case.'' She was hysterical and crying, and, except for giving her name and occupation, refused to answer any questions without the advice of her attorney.

    The law is clear that in this type of proceeding the courts may not inquire into the sufficiency of evidence to support an indictment, provided there is some evidence to sup-

port it; but an indictment is void, and confers no jurisdiction upon a trial court to proceed with trial, where there is no evidence to connect the accused with the crime charged. (*Greenberg* v. *Superior Court*, 19 Cal.2d 319 [121 P.2d 713].) In determining whether there is such evidence to support the indictment of Mary Jensen, we may assume that the uncorroborated testimony of the parents, who were accomplices (*People* v. *Wilson*, 25 Cal.2d 341, 346 [153 P.2d 720] ; *People* v. *Stone*, 89 Cal.App.2d 853, 870 [202 P.2d 333] ; *People* v. *Powell*, 34 Cal.2d 196, 201, 203 [208 P.2d 974]), would be sufficient to support the indictment if it supplied some evidence of guilt, although such testimony would not by itself justify a conviction. (See *Greenberg* v. *Superior Court, supra,* 19 Cal.2d at p. 322, commenting upon *In re Kennedy,* 144 Cal. 634 [78 P. 34, 103 Am.St.Rep. 117, 1 Ann.Cas. 840, 67 L.R.A. 406] ; *Stern* v. *Superior Court,* 78 Cal.App.2d 9, 17 [177 P.2d 308] ; *Abbott* v. *Superior Court,* 78 Cal.App.2d 19, 21 [177 P.2d 317].) Our inquiry is thus confined to the sole question whether the testimony heretofore related, including that of the parents, when considered in relation to the record as a whole, discloses a rational basis for an assumption of Mary Jensen's guilt.

It is perhaps trite to observe that the legal, as well as practical, consequences of otherwise identical facts frequently vary as the accompanying context and environment vary. And where the evidence touching the accused is purely circumstantial, as it is here, the weight to be given to each circumstance must be relative to its influence upon the complete picture. These truisms are peculiarly important here in view of the unusual situation which was thrust upon petitioner. Accordingly, in viewing the evidence, it must be constantly remembered that Mary Jensen was *Dr. Bunker's nurse,* and not Dr. Arons' nurse. There is no evidence whatsoever that she was employed by Dr. Arons, that she was paid by him, nor as to the extent of her services for him. So far as appears, her services, such as they were, might have been included in the arrangement between the two physicians. There was no evidence that she was aware of the nature or details of Dr. Arons' practice, nor evidence as to the nature of the services she was supposed to render him. We have this day held that Dr. Bunker was not shown to have been implicated in the abortion in the slightest degree. There was no evidence that he had any suspicion of illegal practices on the part of Dr. Arons.

It must be presumed that his own practices, as well as the services which petitioner was accustomed to render to him, were in all respects lawful and ethical.

With these facts in mind, it becomes exceedingly plain that no evidence was presented to the grand jury from which it might be rationally inferred that Mary Jensen was connected with the offense of which she was charged. As Dr. Bunker's nurse, who remained in his offices while Dr. Arons was using them, it would naturally be her duty under the circumstances to meet Dr. Arons' patients, assist them when requested, make telephone calls at the direction of Dr. Arons, and otherwise carry out his instructions. There is no evidence whatsoever that she knew an abortion was to take place, or that she even knew Miss B was pregnant, except insofar as she might have surmised as much from feeling her body. In connection with the latter testimony, however, we think it of the utmost significance that Dr. Arons said, when he directed Mary to place her hands upon the patient's abdomen, "That's just liquid." Since the mother, the only other person present, was fully aware that her daughter was pregnant, and had come to Dr. Arons to alleviate that condition, the only rational explanation of his remark is that it was designed to deceive and allay any suspicions of petitioner. This testimony, together with the evidence that Arons was careful not to discuss the proposed abortion or permit the money to be paid in the presence of petitioner, and the complete lack of any evidence that petitioner assisted Dr. Arons in any manner other than as stated, leads irresistibly to the conclusion that Dr. Arons surreptitiously attempted to procure the abortion without the knowledge or assistance of Mary Jensen. Every circumstance in evidence which bears upon the question of petitioner's knowledge of Dr. Arons' unlawful acts tends to prove that he concealed their character from her.

It is only reasonable to assume that Mary's telephone calls to Dr. Bluechel and the parents were made pursuant to Dr. Arons' instructions. It is difficult to imagine that petitioner spoke of the patient's condition otherwise than as specifically directed by Dr. Arons. Since the representations that the patient had acute appendicitis clearly derived from Arons, and were no doubt made to arrange for surgery and hospitalization, their falsity in no way reflects upon petitioner's innocence. We find no evidence in the record tending to prove that petitioner had knowledge of their falsity. In any event, even if it were permissible (which we

do not concede to be the case) to infer knowledge that an abortion had been committed from the equivocal statement of petitioner to the mother that the daughter would enter the hospital "as an acute appendectomy," and the request that she caution her "to say it was appendicitis," such knowledge and ensuing conduct was subsequent to the offense, and accordingly could not provide a basis for holding petitioner to answer for the offense charged. (*People* v. *Viets*, 79 Cal.App. 576, 591 [250 P. 588]; *People* v. *King*, 30 Cal.App.2d 185, 196 [85 P.2d 928].)

In oral argument, the People placed considerable reliance upon petitioner's refusal to answer questions put to her by the arresting officer. It is argued that an inference of guilt arises from failure to deny accusatory statements. The obvious answer is that none of the questions was in any manner accusatory. In any event, the evidence is clear that just prior to her arrest, in the presence of the arresting officers, petitioner was advised by her attorney over the telephone not to speak about the case. In *People* v. *Simmons*, 28 Cal.2d 699, 715 [172 P.2d 18], it was said that advice of counsel is one out of many forms of restraint which may bar a free response to accusatory statements. One who has been placed under arrest is under no duty to engage in a general discussion of his conduct with the arresting officer. No legitimate inference of guilt consciousness could possibly be derived from petitioner's silence under the circumstances of the present case.

Where the evidence is wholly circumstantial and in every aspect is reasonably consistent with innocence, the mere fact that the circumstances may also be reconciled with guilt will not justify an indictment. The grand jury may not resolve all implications in favor of guilt by substituting a presumption of guilt for one of innocence.

Upon thorough consideration of the record before us, we are compelled to conclude that there is a complete lack of any evidence to support the indictment as to petitioner. The most that can be said for the testimony relied upon by the district attorney is that it may create a suspicion of guilt.

Our conclusion has been influenced somewhat by the fact that the grand jury upon the same evidence also returned an indictment against Dr. Bunker. If there had been evidence which justified an indictment of Dr. Bunker we would entertain a different view of the evidence as applied to Mary Jensen who was his employee, and not the employee of Dr.

Arons. Our conclusion in the case of Dr. Bunker was that he had no knowledge that Dr. Arons was using his office facilities for illegal purposes.. We find no evidence that Dr. Arons did not maintain the same secrecy with respect to Mary Jensen. As we have seen, the only statement he made to her concerning the patient's condition before the operation was calculated to mislead her. It is our opinion that the unwarranted assumption by the grand jury that Dr. Bunker was a participant in the illegal acts of Dr. Arons led to the indictment of Mary Jensen and that she would not have been indicted had Dr. Bunker been exonerated. It is possible, of course, to suspect complicity with Dr. Arons upon the part of both Dr. Bunker and petitioner, but the only view of the evidence which appeals to us as reasonable is that both were the victims of circumstances brought about by the machinations of Dr. Arons. There was insufficient evidence to overcome "the right of a person to be free from prosecution for crime unless there is some rational ground for assuming the possibility that he is guilty." (*Greenberg* v. *Superior Court, supra,* 19 Cal.2d at p. 322.) We are convinced that it would be a grave injustice to petitioner if she were required to undergo the ordeal, ignominy, and expense of a trial under the circumstances.

It is a proper case for the issuance of a writ of prohibition. Let.the peremptory writ issue.

Vallée, J., concurred.

WOOD, J.—I concur in the judgment. I do not approve the statements that an indictment against Bunker was not justified.

A petition for a rehearing was denied March 6, 1950, and respondent's petition for a hearing by the Supreme Court was denied April 17, 1950. Shenk, J., Edmonds, J., and Spence, J., voted for a hearing.